**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT BECKLEY**

ELIZABETH MARIE PHILLIPS,

Plaintiff,

v. CIVIL ACTION NO. 5:25-cv-00683

BENJAMIN "BEN" HATFIELD,
*former prosecuting attorney of Raleigh County,*
*West Virginia, an individual,* and
RALEIGH COUNTY COMMISSION,
*a political subdivision,* and
LINDA EPLING,
*a Raleigh County Commissioner, in her individual capacity,* and
DANIEL J. HALL,
*a Raleigh County Commissioner, in his individual capacity,* and
GREGORY DUCKWORTH,
*a Raleigh County Commissioner, in his individual capacity*, and
JOHN/JANE DOE,
*individually and as employees of the Raleigh County Commission*
*and/or servants at the pleasure of former prosecuting attorney*
*Benjamin "Ben" Hatfield,*

Defendants;

MELANIE LYNN ELLISON,

Plaintiff,

v. CIVIL ACTION NO. 5:25-cv-00684

BENJAMIN "BEN" HATFIELD,
*former prosecuting attorney of Raleigh County,*
*West Virginia, an individual,* and
RALEIGH COUNTY COMMISSION,
*a political subdivision,* and
LINDA EPLING,
*a Raleigh County Commissioner, in her individual capacity,* and
DANIEL J. HALL,

*a Raleigh County Commissioner, in his individual capacity,* and
GREGORY DUCKWORTH,
*a Raleigh County Commissioner, in his individual capacity*, and
JOHN/JANE DOE,
*individually and as employees of the Raleigh County Commission and/or servants at the pleasure of former prosecuting attorney Benjamin "Ben" Hatfield,*

Defendants;

TABATHA LYNN FRAZIER,

Plaintiff,

v. CIVIL ACTION NO. 5:25-cv-00685

BENJAMIN "BEN" HATFIELD,
*former prosecuting attorney of Raleigh County, West Virginia, an individual,* and
RALEIGH COUNTY COMMISSION,
*a political subdivision,* and
LINDA EPLING,
*a Raleigh County Commissioner, in her individual capacity,* and
DANIEL J. HALL,
*a Raleigh County Commissioner, in his individual capacity,* and
GREGORY DUCKWORTH,
*a Raleigh County Commissioner, in his individual capacity*, and
JOHN/JANE DOE,
*individually and as employees of the Raleigh County Commission and/or servants at the pleasure of former prosecuting attorney Benjamin "Ben" Hatfield,*

Defendants;

ASHLEY BROOKE ACORD,

Plaintiff,

v. CIVIL ACTION NO. 5:26-cv-00105

BENJAMIN "BEN" HATFIELD,
*former prosecuting attorney of Raleigh County, West Virginia, an individual,* and

RALEIGH COUNTY COMMISSION,
*a political subdivision,* and
LINDA EPLING,
*in her capacity as a Raleigh County Commissioner,* and
DANIEL J. HALL,
*in his capacity as a Raleigh County Commissioner,* and
GREGORY DUCKWORTH,
*in his capacity as a Raleigh County Commissioner,* and
JOHN/JANE DOE,
*employees of the Raleigh County Commission and/or servants at the pleasure of former prosecuting attorney Benjamin "Ben" Hatfield,*

Defendants;

LINDSAY CAROLINE THOMPSON,

Plaintiff,

v. CIVIL ACTION NO. 5:26-cv-00173

BENJAMIN "BEN" HATFIELD,
*former prosecuting attorney of Raleigh County, West Virginia, an individual*, and
RALEIGH COUNTY COMMISSION,
*a political subdivision,* and
LINDA EPLING,
*a Raleigh County Commissioner, in her individual capacity,* and
DANIEL J. HALL,
*a Raleigh County Commissioner, in his individual capacity,* and
GREGORY DUCKWORTH,
*a Raleigh County Commissioner, in his individual capacity,* and
JOHN/JANE DOE,
*individually and as employees of the Raleigh County Commission and/or servants at the pleasure of former prosecuting attorney Benjamin "Ben" Hatfield*

Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending are Defendants Raleigh County Commission, Linda Epling, Daniel J. Hall, and Gregory Duckworth's ("Commission Defendants") Motions to Dismiss the Complaint in each of the abovenamed actions. [Civil Action No. 5:25-cv-00683 ("*Phillips*"), ECF 22; Civil Action No. 5:25-cv-00684 ("*Ellison*"), ECF 23; Civil Action No. 5:25-cv-00685 ("*Frazier*"), ECF 22;

Civil Action No. 5:26-cv-00105 ("*Acord*"), ECF 6; Civil Action No. 5:26-cv-00173 ("*Thompson*"), ECF 5]. The Motion to Dismiss in *Acord* was filed February 20, 2026, with the remaining Motions filed March 23, 2026. [*Id.*]. Plaintiffs Phillips, Ellison, Frazier, and Acord responded in opposition to the respective Motions on May 1, 2026, and Plaintiff Thompson responded in opposition to the respective Motions on May 11, 2026. [*Phillips*, ECF 33; *Ellison*, ECF 34; *Frazier*, ECF 34; *Acord*, ECF 16; *Thompson*, ECF 13]. Defendants replied on May 18, 2026. [*Phillips*, ECF 38; *Ellison*, ECF 39; *Frazier*, ECF 39; *Acord*, ECF 24; *Thompson*, ECF 19]. The matters are ready for adjudication.

**I.**

***A. Factual Allegations***

This action arises from the Plaintiffs' respective employment with the Office of the Raleigh County Prosecuting Attorney ("RCPA's Office"). [*Phillips,* ECF 7 ¶ 11]. During the Plaintiffs' employment at the RCPA's Office, Defendant Benjamin Hatfield served as the Raleigh County Chief Prosecuting Attorney. Ms. Thompson and Ms. Acord served as Assistant Prosecuting Attorneys, while Ms. Ellison, Ms. Phillips, and Ms. Frazier held positions as legal assistants. [*Acord*, ECF 1 ¶ 1; *Thompson*, ECF 1-1 ¶ 1; *Ellison*, ECF 7 ¶ 1; *Phillips*, ECF 7 ¶ 1; *Frazier*, ECF 7 ¶ 1].[1]. During their employment, Plaintiffs worked under the direct supervision and authority of Mr. Hatfield, and Mr. Hatfield worked under the direct supervision and authority of the Commission Defendants. [*Phillips*, ECF 7 ¶ 3].

Plaintiffs allege Mr. Hatfield created a threatening, harassing, and unsustainable working environment during their employment. [*Id.* ¶¶ 66, 105]. They allege Mr. Hatfield treated

[1] For ease of reference, Ms. Thompson's Amended Complaint begins at ECF 1-1 page 208. [*See Thompson*, ECF 1-1 at 208].

female employees differently than the male employees in the workplace, and his behavior "created an incredibly hostile work environment" where Plaintiffs "worked in collective dread and fear of Defendant Hatfield's hostility." [*Id.* ¶¶ 24–25]. Plaintiffs allege they "tried to actively avoid drawing attention from Defendant Hatfield because of his capacity for angry outbursts, personal affronts, and emotional and even physical abuse." [*Id.* ¶ 25].

Specifically, Plaintiffs describe numerous instances in the RCPA's Office where Mr. Hatfield singled out and subjected female employees to unwanted interactions throughout the spring and summer of 2024. [*Id.* ¶ 35]. For example, Mr. Hatfield once "placed several female members of the office into 'time-out' by ordering them into a small conference room and requiring that they sit there as long as an entire work day due to his anger." [*Id.* ¶ 25]. Mr. Hatfield also inappropriately induced Plaintiffs into physical contact with him in the RCPA's Office, making some female employees hold hands with him during conversations. [*Id.* ¶ 74]. Mr. Hatfield would insist "females (and some males) in the office" view "sexually inappropriate pictures that he found of criminal defendants online, unrelated to the criminal prosecutions of said defendants." [*Acord,* ECF 1 ¶ 34]. However, Plaintiffs assert "no male employees" experienced the treatment female employees endured. [*Ellison*, ECF 7 ¶ 23].

Plaintiffs further contend Mr. Hatfield would send inappropriate text messages to certain female employees outside of office hours and unrelated to their duties. [*Phillips*, ECF 7 ¶ 11]. Plaintiffs Phillips, Frazier, Acord, and Thompson interpreted this communication as "grooming" behavior and felt obliged to respond to Mr. Hatfield. [*Phillips*, ECF 7 ¶ 15; *Frazier*, ECF 7 ¶ 17; *Acord*, ECF 1 ¶ 17; *Thompson*, ECF 1-1 ¶ 17]. Among other things, Mr. Hatfield texted Plaintiffs statements like "[y]ou're wonderful" and "[y]ou will never want to leave here," "[y]ou're my favorite girl" and "[y]ou're the best decision that I have made here," and texted Ms.

Acord that he "wanted to 'get to know' her," and that he "had 'surprises for' her," and "that he vibes with her." [*Phillips*, ECF 7 ¶ 12; *Frazier*, ECF 7 ¶ 17; *Acord*, ECF 1 ¶ 13]. Ms. Acord specifically contends that engaging with Mr. Hatfield through text messages gave her "prime employment opportunities" -- including an invitation to oral argument before the Supreme Court -- which were revoked after her responses to his after-hours messages became less frequent. [*Acord*, ECF 1 ¶¶ 15–19].

Mr. Hatfield regularly engaged in commentary concerning female employees' physical appearances. [*Thompson*, ECF 1-1 ¶ 25]. This included using expletives and cultural stereotypes. [*Id.* ¶ 26]. Mr. Hatfield once made such a comment about Ms. Thompson's body in front of her husband. [*Id.*]. Additionally, Mr. Hatfield gave Ms. Thompson the nickname "the hammer" which she initially thought was a form of praise for her work when, in fact, she came to learn Mr. Hatfield was referring to her physique. [*Id.* ¶ 27].

Plaintiffs allege Mr. Hatfield's behavior became more erratic and aggressive in 2024 following "public and local media reports of allegations made against [him] in a domestic violence petition." [*Acord*, ECF 1 ¶ 36]. Plaintiffs allege he "stood and stared at female employees and staff, and was frightening to be around." [*Id.*]. In the weeks following the initial publicity of the incident, Mr. Hatfield "forced females in the office to listen to his story of receiving oral sex while going through a drive through, lengthy missives about other of his sexual escapades, and insisted that they support him through the flurry of accusations arising about him." [*Id.*].

As assistant prosecuting attorneys, both Ms. Thompson and Ms. Acord allege Mr. Hatfield's conduct -- specifically related to the publicized domestic violence petition against him -- threatened their professional reputations. [*Thompson*, ECF 1-1 ¶ 130; *Acord*, ECF 1 ¶ 98]. Specifically, Ms. Acord contends Mr. Hatfield's "criminal cases had allegedly been bargained in

return for sexual favors." [*Acord,* ECF 1 ¶ 36]. As a result of these allegations, Ms. Acord contends the RCPA's office "became unendurable as Hatfield's effectiveness as a prosecutor waned, with police agencies refusing to participate in Hatfield involved matters." [*Id.* ¶ 37]. Further, the assistant prosecutors became concerned about whether any cases they had personally worked on were compromised by Mr. Hatfield's conduct. [*Id.* ¶ 36].

In the fallout from the public attention to the above allegations, Mr. Hatfield would threaten Plaintiffs "about the importance of remaining loyal to him." [*Id.* ¶ 38]. Plaintiffs allege that both Mr. Hatfield and the Commission Defendants had certain employees warn Plaintiffs that they would "pay for it" if they were not loyal to Mr. Hatfield through the scandal. [*Id.*]. At one point, he threatened to "wipe out the third floor" which was occupied by Ms. Acord and other assistant prosecuting attorneys. [*Id.* ¶ 39]. Plaintiffs allege Mr. Hatfield became "paranoid about disloyalty" and they believed he began spying on RCPA office employees through the security camera system. [*Frazier*, ECF 7 ¶ 41]. Mr. Hatfield eventually took a voluntary leave of absence. [*Acord,* ECF 1 ¶ 47]. During that leave of absence, an employee who supported Mr. Hatfield assisted him with entering the office surreptitiously. [*Phillips,* ECF 7 ¶ 60]. When Mr. Hatfield returned from his leave, he "made the workplace nearly unendurable." [*Id.* ¶ 62]. Mr. Hatfield immediately fired a colleague upon his return to the office, which caused Plaintiffs to "experience chronic worry and fear that they too would be fired from their positions." [*Id.* ¶¶ 62–64].

Collectively, Plaintiffs allege the Commission Defendants failed to properly protect them from Mr. Hatfield's toxic and harassing behavior. [*Id.* ¶¶ 47, 122]. They allege the Commission Defendants established a custom and practice of "deliberate indifference to employee well-being" by virtue of their "failure to protect employees" through their deliberate decision not to provide reasonable reporting mechanisms, including "HR, resources, call lines, handbooks,

guidelines or the like." [*Id.* ¶ 47]. They contend this custom and practice exacerbated and perpetuated Mr. Hatfield's harmful conduct towards the female employees in the RCPA's office. [*Id.*].

Following the domestic violence petition incident, Plaintiffs allege the Commission Defendants rejected Mr. Hatfield's resignation despite (1) their awareness of the publicized domestic violence allegations against him, and (2) a letter from three local judges expressing their concern and requesting an investigation into Mr. Hatfield's conduct. [*Id.* ¶¶ 43–45, 48]. Commissioner Gregory Duckworth allegedly had personal motives which influenced his decision-making related to Mr. Hatfield's conduct. Specifically, Mr. Duckworth "expressly directed" employees to attend work despite his knowledge of Mr. Hatfield's ongoing harassment and misconduct towards the female employees in the RCPA's office. [*Id.* ¶ 62; *Ellison,* ECF 7 ¶ 53]. One male colleague reported Mr. Hatfield's "malfeasance" in the RCPA's office to the Commission Defendants, they took no action, and instead Mr. Hatfield subsequently fired the reporting colleague. [*Frazier,* ECF 7 ¶¶ 59–60].

The Commission Defendants eventually established a human resources call line and provided subsidized therapy access to employees of the RCPA's office in the fall of 2024. [*Ellison,* ECF 7 ¶¶ 57, 59]. However, these efforts appeared to be in vain. [*Id.*]. For example, Ms. Frazier alleges she lodged complaints on the hotline but received no assistance thereafter, and Ms. Ellison explains she "experienced daily stress, worry, fear, and anxiety" about retaliation for speaking with the therapists -- specifically after witnessing Mr. Hatfield's history of retaliatory conduct towards others in the RCPA's office. [*Frazier,* ECF 7 ¶ 53; *Ellison,* ECF 7 ¶ 58]. When the Commission Defendants finally initiated an investigation into Mr. Hatfield's conduct in October 2024, Plaintiffs only became aware of the investigation through public media outlets. [*Ellison,* ECF 7 ¶ 59]. The

Commission Defendants never personally informed any of the Plaintiffs about the investigation and never interviewed or sought information about Plaintiffs' experiences with Mr. Hatfield. [*Id.*]. Plaintiffs contend the Commission Defendants' response to Mr. Hatfield's conduct constituted deliberate indifference. [*Phillips,* ECF 7 ¶ 46].

### *B. Procedural History*

Plaintiffs instituted this action through five individual Complaints. [*Phillips*, ECF 7; *Ellison*, ECF 7; *Frazier*, ECF 7; *Acord*, ECF 1; *Thompson*, ECF 1-1] (collectively "Complaints"). They bring claims for (1) Sexual Harassment in Violation of the Human Rights Act and Title VII of the Civil Rights Act, (2) Gender Discrimination in Violation of the Human Rights Act, (3) Hostile Work Environment; (4) Civil Rights Violations under 42 U.S.C. §§ 1983 and 1988, (5) Negligence, (6) Conspiracy, (7) Employer Liability for Sexual Harassment, and (8) Intentional Infliction of Emotional Distress.[2]

The Commission Defendants seek dismissal of Plaintiffs' Complaints contending (1) Plaintiffs failed to sufficiently allege Mr. Hatfield's conduct was based on their gender, and (2) Mr. Hatfield's conduct exceeded the scope of his employment. [*Phillips,* ECF 23 at 9]. Additionally, the Commission Defendants contend they took action to mitigate the conduct complained of shortly before Mr. Hatfield's termination. [*Id.* at 17]. Plaintiffs oppose dismissal, contending (1) they have alleged facts showing Mr. Hatfield's conduct was gender-based, and (2) the question of whether the Commission Defendants' response was reasonable under the circumstances is fact-intensive and should not be decided at the motion to dismiss stage. [*Phillips,* ECF 33 at 8–9, 12].

[2] The Intentional Infliction of Emotional Distress Claim is numbered IX in the Complaints, but the Court notes there are only eight (8) total counts in those Complaints including Count IX.

**II.**

*Federal Rule of Civil Procedure* 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief." Fed. R. Civ. P. 8(a)(2); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Any defense presented under Rule 12(b)(6) "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). Thus, the motion to dismiss must be filed before any answer to the complaint is filed. Additionally, and as an aside, any answer must be filed within twenty-one days of the issuance of the summons, except for situations wherein that timeline is enlarged by the court. Fed. R. Civ. P. 12(a).

The required "short and plain statement" must provide "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted); *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015). Additionally, the showing of an "entitle[ment] to relief" amounts to "more than labels and conclusions." *Twombly*, 550 U.S. at 555. It is now settled that "a formulaic recitation of the elements of a cause of action will not do." *Id.*; *McCleary-Evans*, 780 F.3d at 585; *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020), *cert. denied*, 209 L. Ed. 2d 122, 141 S. Ct. 1376 (2021); *Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008).

The complaint need not "forecast evidence sufficient to prove the elements of [a] claim," but it "must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 291 (4th Cir. 2012)) (internal quotation marks omitted). Stated another way, the operative pleading need

only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting the opening pleading "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). In sum, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Robertson*, 679 F.3d at 288.

The decision in *Iqbal* provides some additional markers concerning the plausibility requirement:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief . . . .'"
>
> Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 556 U.S. at 678–79 (citations omitted).

As noted in *Iqbal*, the Supreme Court has consistently interpreted the Rule 12(b)(6) standard to require a court to "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555–56); *see*

*also S.C. Dep't of Health & Env't Control v. Com. & Indus. Ins. Co.*, 372 F.3d 245, 255 (4th Cir. 2004) (citing *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir. 2002)). The court is required to "draw[] all reasonable . . . inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

**III.**

### *A. Employee Handbook*

The Court first addresses the parties' dispute regarding the "Raleigh County Employee Handbook" ("the Handbook"). [*Phillips,* ECF 22, Exs. A, B]. The Commission Defendants have attached the Handbook to the Motions to Dismiss,[3] contending it should be incorporated by reference inasmuch as Plaintiffs allege that no employee handbook existed during their employment. [*Phillips,* ECF 23 at 1–2]. Plaintiffs, on the other hand, contend incorporation and consideration of the Handbook is inappropriate at this stage. [*Phillips,* ECF 33 at 12–13].

At the motion to dismiss stage, Rule 12(d) "ordinarily prohibits a court from considering evidence outside the pleadings on a motion to dismiss." *Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024). Consideration of outside evidence converts the motion to dismiss "to one for summary judgment." *Id*. However, the Court must consider documents "incorporated into the complaint by reference" at the motion to dismiss stage. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Additionally, attachments to a motion to dismiss may be considered "when the document is 'integral to the complaint and there is no dispute about the document's authenticity.'" *Sletten*, 109 F.4th at 679 (4th Cir. 2024) (quoting

[3] Defendants fail to attach the handbook to the Motion to Dismiss for Plaintiff Acord. Inasmuch as the Court is addressing all of Plaintiffs' claims together, the Court will consider the handbook as to Ms. Acord as well.

*Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)).

Plaintiffs oppose incorporation of the Handbook, asserting it is "a matter outside the pleadings which is neither referenced in nor integral to the Complaint" and therefore should not be considered. [*Phillips,* ECF 33 at 13]. Plaintiffs do, however, raise the question of the handbook's existence in their Complaints, alleging "there was no county employee handbook, no on-boarding training, and no published rules for conduct, reporting or supervision of someone in a position of power such as Hatfield." [*Phillips,* ECF 7 ¶ 17]. Inasmuch as Plaintiffs allege there was no handbook, and the Commission Defendants attach the Handbook to respond to that allegation, the Court finds it appropriate to incorporate the Handbook by reference. Many of Plaintiffs' claims center on institutional customs and policies, and the Court finds the document is integral to the complaint. Inasmuch as Plaintiffs do not contest the authenticity of the document, it will be considered.

## ***B. West Virginia Human Rights Act***

### 1. Gender-Based Conduct

The West Virginia Human Rights Act ("WVHRA") makes it unlawful "[f]or any employer to discriminate against an individual with respect to . . . conditions, or privileges of employment." W. Va. Code § 16B-17-9(1). To establish a sexual harassment claim under the WVHRA

> based upon a hostile or abusive work environment, a plaintiff-employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) it was imputable on some factual basis to the employer.

*Constellium Rolled Prod. Ravenswood, LLC v. Griffith*, 235 W. Va. 538, 544, 775 S.E.2d 90, 96

(2015) (quoting Syl. Pt. 5, *Hanlon v. Chambers*, 195 W.Va. 99, 103, 464 S.E.2d 741, 745 (1995)); Syl. Pt. 5, *CSX Transp., Inc. v. Smith*, 229 W. Va. 316, 320, 729 S.E.2d 151, 155 (2012). Violative conduct includes "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ha[ving] the purpose or effect of unreasonably interfering with an individual's work performance or creat[ing] an intimidating, hostile, or offensive working environment." Syl. Pt. 3, *Roth v. DeFeliceCare, Inc*., 226 W. Va. 214, 219–20, 700 S.E.2d 183, 188–89 (2010) (quoting Syl. Pt. 7, *Hanlon*, 195 W.Va. at 102).

The Commission Defendants fail to provide any authority supporting their contention that Mr. Hatfield's conduct was not gender based. Instead, Plaintiffs allege Mr. Hatfield sent text messages outside of work hours that were "too familiar, overtly too friendly . . . [and] tending to suggest some kind of special relationship," all of which Plaintiffs interpreted as "seemingly grooming some members of the prosecutor's office." [*Phillips,* ECF 7 ¶¶ 22–23]. These texts -- which often arrived repeatedly and well into the evening hours -- included statements like "[y]ou're wonderful" [*Id.* ¶ 12], and "[y]ou're my favorite girl" [*Frazier*, ECF 7 ¶ 17]. Mr. Hatfield once locked multiple women in his office with him for multiple hours and "proceeded to make them listen to the extremely graphic and lurid details of his sexual exploits." [*Phillips,* ECF 7 ¶ 37]. Mr. Hatfield also recognized male attorneys' accomplishments as opposed to those of female attorneys. [*Frazier*, ECF 7 ¶ 31]. He "often insist[ed] on holding hands with female employees during conversations." [*Frazier*, ECF 7 ¶ 18]. He would make, and sought reciprocation of, heart-shape gestures with his hands when walking by certain female employees. [*Id.* ¶ 40]. He made explicit comments about female employees' body parts. [*Thompson*, ECF 1-1 ¶ 26]. This inappropriate and unwanted pattern of communication was ongoing. [*Phillips,* ECF 33 at 5–6].

The Commission Defendants do not provide any factual support for the assertion

that Mr. Hatfield's conduct was not gender-based. Plaintiffs have sufficiently alleged Mr. Hatfield engaged in "verbal or physical conduct of a sexual nature" including (1) holding hands with female employees, (2) calling an employee his "favorite girl," (3) discussing a female employee's physical attributes using expletives, and (4) detailing the sexual exploits that became the subject of a separate domestic violence case. Plaintiffs allege the aforementioned conduct interfered with their work and created an "intimidating, hostile, or offensive working environment." *Roth*, 226 W. Va. at 219–220. Inasmuch as Plaintiffs allege this conduct was directed only toward women in the RCPA's office, the Court concludes a plausible claim is alleged for gender-based discrimination and sexual harassment.

**2. Scope of Employment**

The Commission Defendants next contend Mr. Hatfield's conduct -- presuming it was gender-based -- exceeded the scope of his employment. [*Phillips,* ECF 23 at 8]. Pursuant to the *West Virginia Code of State Rules* "[a]n employer . . . is responsible for its acts and those of its officers, agents and supervisory employees with respect to sexual harassment." W. Va. Code R. § 71-4-3.1. Liability attaches "regardless of whether the employer knew or reasonably should have known" of the conduct unless the "officer, agent or supervisory employee was acting outside the scope of his employment." *Id.*

"'Scope of employment' is a relative term and requires a consideration of surrounding circumstances including the character of the employment, the nature of the wrongful deed, the time and place of its commission and the purpose of the act." *W. Virginia Div. of Corr. & Rehab. v. Robbins*, 248 W. Va. 515, 530, 889 S.E.2d 88, 103 (2023) (citing *Griffith v. George Transfer & Rigging, Inc.*, 157 W. Va. 316, 326, 201 S.E.2d 281, 288 (1973)). The "purpose of the act is of critical importance . . . a servant is within scope of employment if the conduct is 1) *of the*

*kind he is employed to perform*; 2) occurs within the authorized time and space limits; [and] 3) it is actuated, at least in part, by a *purpose to serve the master* . . . ." *W. Virginia Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 510, 766 S.E.2d 751, 769 (2014) (internal quotations omitted). "Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when the facts are undisputed and no conflicting inferences are possible." *W. Virginia Div. of Corr. & Rehab. v. Robbins*, 248 W. Va. 515, 530, 889 S.E.2d 88, 103 (2023) (quoting *W. Virginia Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 509, 766 S.E.2d 751, 768 (2014)).

The Commission Defendants contend Mr. Hatfield "far exceeded the scope of his role as prosecuting attorney" because his communication with Plaintiffs was "clearly *personal*." [*Phillips,* ECF 23 at 10; *Phillips,* ECF 38 at 3]. Accordingly, they contend, they are not liable under West Virginia Rule § 71-4-3. Plaintiffs, on the other hand, contend Mr. Hatfield's conduct occurred within his scope of employment. [*Phillips,* ECF 33 at 7]. Inasmuch as the parties hold conflicting views as to the scope of Mr. Hatfield's conduct, factual questions remain as to whether Mr. Hatfield's conduct exceeded the scope of his employment. Thus, dismissal of these claims is inappropriate at this juncture.

**3. The Commission Defendants' Failure to Act**

The Commission Defendants next contend Plaintiffs "fail[] to delineate any fact which may be assumed as true to support the allegation that the Commission or its Commissioners failed to act promptly or appropriately." [*Phillips,* ECF 23 at 9]. Taking the facts alleged in the Complaints as true, Plaintiffs have sufficiently alleged the Commission Defendants failed to respond to the issues Plaintiffs reported regarding Mr. Hatfield's conduct.

For example, Ms. Ellison made multiple requests to work from home to minimize

her exposure to Mr. Hatfield, but the Commission Defendants instead told Ms. Ellison to make those requests through Mr. Hatfield. [*Ellison,* ECF 7 ¶ 49]. Outside sources who became aware of Mr. Hatfield's behavior -- including local judges -- requested that the Commission Defendants investigate Mr. Hatfield's conduct. [*Phillips*, ECF 7 ¶ 43]. Significantly, Plaintiffs allege a fellow male colleague was terminated shortly after reporting Mr. Hatfield's conduct to the Commission Defendants. [*Id.* ¶ 48]. Despite the Commission Defendants' awareness -- through multiple such reports -- Plaintiffs assert the Commission Defendants took no action to mitigate Mr. Hatfield's conduct. [*Id.*]. Even after the Commission Defendants established a clear reporting line, Plaintiffs allege the Commission Defendants remained unresponsive to Plaintiffs' reported concerns. [*Ellison,* ECF 7 ¶ 59]. Construing the allegations in the light most favorable to the Plaintiff, the Court concludes Plaintiffs have sufficiently alleged claims for sexual harassment, gender discrimination, and hostile work environment pursuant to the WVHRA.

Accordingly, Defendants' Motions to Dismiss as to Counts I, II, III, and VII are **DENIED**.

***C. Title VII***

Title VII of the Civil Rights Act makes it unlawful "to discriminate against[] any individual because of his race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2. An employer shall not discriminate "with respect to [] compensation, terms, conditions, or privileges of employment." *Id.* A plaintiff states a claim for sexual harassment under Title VII if she alleges the conduct is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (quoting *Faragher v. Boca Raton,* 524 U.S. 775, 786 (1998)).

To prevail on a claim of sexual harassment based on a hostile work environment "a

plaintiff must prove (1) unwelcome conduct; (2) based on the plaintiff's sex; (3) sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) that is imputable to the employer." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 117 (4th Cir. 2021) (citing *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)). The Commission Defendants contend Plaintiffs' Title VII claims fail because they have not established a relationship between Plaintiffs' gender and Mr. Hatfield's conduct. [*Phillips,* ECF 23 at 11]. Instead, the Commission Defendants contend Mr. Hatfield's conduct was -- though inappropriate -- devoid of connection to any protected class or characteristic. *Id.* As discussed more thoroughly *supra*, Plaintiffs have plausibly alleged facts establishing a relationship between their gender and Mr. Hatfield's conduct.

Accordingly, the Commission Defendants' Motion to Dismiss Count I pursuant to Title VII is **DENIED**.

### ***D. 42 U.S.C. § 1983***

#### **1. *Monell* Liability**

Title 42 U.S.C. § 1983 governs actions against state officers for certain civil rights violations as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. "For purposes of Section 1983, a municipality is considered a 'person' and thus is subject to suit." *Hunter v. Town of Mocksville*, 897 F.3d 538, 553 (4th Cir. 2018) (citing *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978)). The United States Court of Appeals for the Fourth Circuit recognizes "a municipality cannot be held

liable simply for employing a tortfeasor." *Riddick v. Sch. Bd.*, 238 F.3d 518, 522 (4th Cir. 2000) (citing *Monell*, 436 U.S. at 691). Instead, "when an alleged constitutional deprivation is caused by the official actions of those individuals 'whose edicts or acts may fairly be said to represent official policy,' the government as an entity is responsible under section 1983." *Id.* at 523 (quoting *Monell*, 436 U.S. at 694).

Put differently, a municipality faces liability for constitutional violations "only where the constitutionally offensive actions of employees are taken in furtherance of some municipal 'policy or custom.'" *Walker v. Prince George's Cnty., MD*, 575 F.3d 426, 431 (4th Cir. 2009) (quoting *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984)); *see also Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 470 (4th Cir. 2013) (reasoning that the purpose of this municipal "policy or custom" requirement is to "ensure[] that the municipality is 'responsible' for the alleged violations."). A municipality's violative "policy or custom" exists where the conduct arose from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. "Under this theory of liability, a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987)).

As our Court of Appeals has observed, a plaintiff may establish liability for a policy or custom in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (quoting

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)); *see also Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999); *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010).

Plaintiffs allege the Commission Defendants' omissions "manifest[ed] deliberate indifference" to their constitutional rights. *Id.* Such a deliberate indifference claim requires "proof that a municipal actor disregarded a known or obvious consequence of [their] action[s]." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). Further, Plaintiffs must show a "'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386–91). "Sporadic or isolated violations of rights will not give rise to Monell liability; only 'widespread or flagrant' violations will." *Id.* at 403 (quoting *Spell*, 824 F.2d at 1387).

The Commission Defendants contend Plaintiffs have failed to allege facts showing they acted with deliberate indifference towards Plaintiffs' constitutional rights. [*Phillips,* ECF 23 at 13]. However, Plaintiffs' pleadings -- which describe Mr. Hatfield's pervasive misconduct over the course of months -- allege the Commission Defendants failed "to put a stop to or correct a widespread pattern of unconstitutional conduct." *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). Among other things, the Commission Defendants were approached by third parties regarding Mr. Hatfield's misconduct and local judges wrote the Commission Defendants raising concerns about the publicized domestic violence allegations against Mr. Hatfield. [*Phillips,* ECF 7 ¶¶ 36, 37]. The Commission Defendants' collective awareness of the impact of Mr. Hatfield's behavior is further bolstered by the allegation that Defendant Duckworth instructed RCPA office employees that their failure to attend work would result in termination -- a message that was

disseminated after Mr. Hatfield "returned to the office, fired a colleague . . . and made the workplace nearly unendurable." [*Id.* ¶ 62].

Further, the Commission Defendants -- in response to the publicized domestic violence allegations against Mr. Hatfield -- suggested that each of the female employees have "one on one" meetings with Mr. Hatfield "so he could explain and 'win them back.'" [*Id.* ¶ 39]. The Commission Defendants' (1) actual knowledge of misconduct in the workplace, and (2) failure to correct it are further highlighted by a separate lawsuit filed in 2024 against the Raleigh County Commission alleging gender discrimination, sexual harassment, and the Commission Defendants' failure to take corrective actions and provide human resources personnel. *Owens*, 767 F.3d at 402; [*Phillips,* ECF 7 ¶ 33]. Notwithstanding the above, the Commission Defendants had an opportunity to accept Mr. Hatfield's resignation but instead refused it and attempted to reintegrate Mr. Hatfield into the workplace. [*Phillips,* ECF 7 ¶ 41]. These allegations give rise to a "persistent and widespread practice[]" of a substantial "duration and frequency" supporting Plaintiffs' allegations that the Commission Defendants acted with deliberate indifference towards Plaintiffs' constitutional rights. *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386–91) (internal quotations omitted).

Accordingly, Plaintiffs have sufficiently alleged facts establishing the Commission Defendants had a policy or custom that violated Plaintiffs' constitutional rights.

**2. Equal Protection**

Plaintiffs additionally allege the Commission Defendants violated their Fourteenth Amendment rights to equal protection.[4] [*Phillips,* ECF 7 ¶ 112]. The Fourteenth Amendment

[4]Ms. Acord's Complaint also alleges claims for First and Eighth Amendment violations, which she abandons in her Response to Defendants' Motion to Dismiss. [*Acord,* ECF 16 at 10 n.5].

requires that "[n]o state . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To establish a Fourteenth Amendment equal protection claim, "a plaintiff must first demonstrate that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). The Commission Defendants again contend Plaintiffs fail to establish they were treated differently because of their gender. [*Phillips,* ECF 23 at 14]. As discussed *supra*, Plaintiffs have sufficiently alleged facts showing they were "treated differently from others" in the RCPA's office and "the unequal treatment was the result of intentional or purposeful discrimination." *Martin*, 858 F.3d at 252. Accordingly, the Commission Defendants' Motion to Dismiss Count IV for Civil Rights Violations pursuant to 42 U.S.C. § 1983 is **DENIED**.

### ***E. Negligence***

Plaintiffs contend the Commission Defendants "were negligent with regard to hiring, training, supervising, retention, and protecting employees." [*Phillips,* ECF 7 ¶ 122]. To state a claim for negligence, the plaintiff must show "that the defendant owes [] a duty, that there was a negligent breach of that duty, and that injuries received by the plaintiff resulted proximately from the breach of the duty." *Jones v. Logan Cnty. Bd. of Educ.*, 247 W. Va. 463, 881 S.E.2d 374, 383 (2022). To establish a duty, there must be "foreseeability that harm may result if [the duty] is not exercised." Syl. Pt. 5, *Wal-Mart Stores E., L.P. v. Ankrom*, 244 W. Va. 437, 854 S.E.2d 257, 262 (2020) (quoting Syl. Pt. 3, *Sewell v. Gregory*, 179 W. Va. 585, 586, 371 S.E.2d 82, 83 (1988)).

The Commission Defendants contend Plaintiffs have failed to plead a breach of any duty that the Commission Defendants owed to Plaintiffs. [*Phillips,* ECF 23 at 16–17]. Specifically,

they contend there was no breach "with respect to acts or omissions concerning employee handbooks, policies concerning harassment or hostile work environments, hiring, retention, supervision, investigating, or acting upon complaints in a timely manner once such complaints were made known to the Commission Defendants." [*Id.* at 17]. Relying on the Handbook, they highlight the Sexual Harassment policy to show the Commission did have policies regarding the above and thus breached no duty to Plaintiffs.

In response, Plaintiffs explain the Commission Defendants breached their duty to Plaintiffs when they became aware of Mr. Hatfield's conduct -- specifically when it was publicized in the news -- and failed to act. [*Phillips,* ECF 33 at 12]. Negligence becomes a "'question[] of fact for the jury where the evidence is conflicting or when the facts, though undisputed, are such that reasonable men draw different conclusions from them.'" Syl. Pt. 9, *Jones v. Logan Cnty. Bd. of Educ.*, 247 W. Va. 463, 881 S.E.2d 374, 376 (2022) (quoting Syl. Pt. 2, *Evans v. Farmer*, 148 W.Va. 142, 143, 133 S.E.2d 710, 711 (1963)). The Commission Defendants contend Plaintiffs fail to plead a breach of the Commission Defendants' duty to Plaintiffs. [*Phillips,* ECF 23 at 17–18].

Plaintiffs have alleged a series of misconduct over the course of months that was never properly mitigated by the Commission Defendants. They contend the Commission Defendants breached their duty by failing to timely respond to complaints about Mr. Hatfield's conduct, and that any response on the Commission Defendants' part did not actually mitigate the harassment in the workplace. Plaintiffs have successfully pled that the Commission Defendants (1) had a duty to protect their constitutional rights as their employer, (2) the Commission Defendants breached that duty when they failed to mitigate Mr. Hatfield's misconduct, and (3) that breach caused harm to Plaintiffs because it exacerbated Mr. Hatfield's conduct and Plaintiffs suffered various physical and emotional consequences based on Mr. Hatfield's behavior.

Accordingly, the Commission Defendants' Motion to Dismiss Count V for Negligence is **DENIED**.

### *F. Intentional Infliction of Emotional Distress*

Plaintiffs additionally bring a claim of Intentional Infliction of Emotional Distress ("IIED") based on the Commission Defendants' conduct.[5] To prevail on an IIED claim, a plaintiff must show:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 11, *Zsigray v. Langman*, 243 W. Va. 163, 166, 842 S.E.2d 716, 719 (2020) (quoting Syl. Pt. 3, *Travis v. Alcon Lab'ys, Inc.*, 202 W. Va. 369, 369, 504 S.E.2d 419, 421 (1998)). This extremely high standard requires the defendant's conduct to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Zsigray*, 243 W.Va. at 174, 842 S.E.2d at 727.

The Commission Defendants contend that Plaintiffs' Complaints, when viewed in conjunction with the attached handbook, fail to state a claim for IIED. Specifically, they contend "[a]ny delay in investigating [Mr.] Hatfield's conduct or seeking his removal" was caused by the Plaintiffs' failure to report the conduct as directed by the Handbook. [*Phillips,* ECF 23 at 20]. Thus, they contend, Plaintiffs fail to show that the Commission Defendants' conduct "was

---

[5] Plaintiff Acord does not bring a claim of Intentional Infliction of Emotional Distress.

atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency." [*Id.*]. The Plaintiffs have not asserted facts supporting the conclusion that the Commission Defendants' conduct was "beyond all possible bounds of decency." *Zsigray*, 243 W.Va. at 174, 842 S.E.2d at 727. The Commission Defendants' failure to provide tangible means to report and mitigate Mr. Hatfield's conduct did -- as alleged -- severely impact the Plaintiffs' workplace. However, their conduct cannot be "regarded as [so] atrocious[] and utterly intolerable in a civilized community" that it constitutes intentional infliction of emotional distress. *Id*.

Inasmuch as Plaintiffs have failed to sufficiently state facts supporting a claim for IIED, the Commission Defendants' Motion to Dismiss Count IX for Intentional Infliction of Emotional Distress is **GRANTED**. Plaintiffs may offer additional allegations via proposed amended complaints filed on or before October 15, 2026.

### *G. Civil Conspiracy*

Under West Virginia common law, civil conspiracy requires "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." *Dunn v. Rockwell*, 225 W. Va. 43, 56, 689 S.E.2d 255, 268 (2009) (quoting *Dixon v. American Indus. Leasing Co.,* 162 W.Va. 832, 834, 253 S.E.2d 150, 152 (1979)). Additionally, 42 U.S.C. § 1985(3) provides a cause of action where "two or more persons . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws . . ." 42 U.S.C. § 1985(3). However, the intracorporate conspiracy doctrine holds that "a corporation cannot conspire with its agents because the agents' acts are the corporation's own." *Brady v. City of Myrtle Beach*, 137 F.4th 233, 241 (4th Cir. 2025) (quoting *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 352 (4th Cir. 2013)) (internal quotations omitted). Our Court of Appeals has extended the intracorporate conspiracy doctrine to

claims arising under 42 U.S.C. § 1985(3). *Brady*, 137 F.4th at 241.

The Commission Defendants contend Count VI should be dismissed inasmuch as the intracorporate conspiracy doctrine precludes civil conspiracy claims against a corporation and its agents or employees. [*Thompson,* ECF 6 at 18].[6] With the exception of Ms. Thompson, all Plaintiffs abandon their Civil Conspiracy claims in their responses. Ms. Thompson maintains her conspiracy claim, noting "a plaintiff may state a conspiracy claim where the agent's acts were not authorized by the corporation." *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 353 (4th Cir. 2013) (citing *Buschi v. Kirven*, 775 F.2d 1240, 1252–53 (4th Cir. 1985)); [*Thompson*, ECF 13 at 17]. This exception, however, requires that the Plaintiff allege "the corporate employees were dominated by personal motives or where their actions exceeded the bounds of their authority." *Buschi*, 775 F.2d at 1252.

This argument contradicts Ms. Thompson's earlier assertion that Mr. Hatfield was acting *within* the scope of his employment for purposes of the Commission Defendants' WVHRA and Title VII liability. It cannot be true that Mr. Hatfield acted *within* the scope of his employment for purposes of the WVHRA and Title VII claims but was *outside* the scope of his employment for purposes of the conspiracy claims. In any event, the claim requires further allegations if it is to proceed. Accordingly, the Commission Defendants' Motion to Dismiss as to Count VI is **GRANTED**, without prejudice to the filing of an amended complaint as earlier permitted.

### *H. Duplicative Official Capacity Claims*

Next, the Commission Defendants seek dismissal of all claims against Linda Epling, Daniel Hall, and Gregory Duckworth in their official capacities as alleged in Ms. Acord's

---

[6] Plaintiffs Acord, Phillips, Frazier, and Ellison concede they will not proceed on the claims of Civil Conspiracy.

Complaint.[7] [*Acord,* ECF 7 at 6]. "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). On the other hand, official-capacity suits are "treated as [suits] against the entity." *King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016) (quoting *Graham*, 473 U.S. at 166). Accordingly, official-capacity claims are properly dismissed when the entity is also sued directly. *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (affirming the district court's dismissal of official-capacity claims against the superintendent as duplicative of those against the Board of Education).

In the instant matter, Ms. Acord has named the Raleigh County Commission. [*Acord,* ECF 1 at 1]. The Raleigh County Commission has retained counsel. Accordingly, the claims against the individual Commission Defendants in their official capacities must be treated as claims against the entity. *Graham,* 473 U.S. at 166. Thus, the claims are duplicative. Further, Ms. Acord does not contest the Commission Defendants' argument in her response to their Motion to Dismiss. [*Acord,* ECF 16].

Accordingly, the Commission Defendants' Motion to Dismiss is **GRANTED** as to all official-capacity claims against Linda Epling, Daniel Hall, and Gregory Duckworth in Civil Action 5:26-cv-00105.

**IV.**

Based upon the foregoing discussion, the Court **GRANTS** in part and **DENIES** in part Commission Defendants' Motions to Dismiss [*Phillips*, Civil Action No. 5:25-cv-00683, **ECF**

---

[7] Only Ms. Acord and Ms. Thompson named the aforementioned Defendants in their official capacities instead of individual capacities. Defendants only seek dismissal of official capacity claims as to Ms. Acord in Civil Action 5:26-cv-00105. Accordingly, relief will not be extended to other matters referenced herein.

**22**; *Ellison*, Civil Action No. 5:25-cv-00684, **ECF 23**; *Frazier*, Civil Action No. 5:25-cv-00685, **ECF 22**; *Acord*, Civil Action No. 5:26-cv-00105, **ECF 6**; *Thompson*, Civil Action No. 5:26-cv-00173, **ECF 5**]. The Court **ORDERS** as follows:

1. That Count VI of each Complaint is **DISMISSED**;
2. That Count IX of each Complaint asserting that claim is **DISMISSED**;
3. That all claims against Linda Epling, Daniel Hall, and Gregory Duckworth in their official capacities are **DISMISSED** in Civil Action No. 5:26-cv-00105.

The Clerk is **DIRECTED** to send a copy of this written opinion and order to all counsel of record and any unrepresented parties.

ENTER: September 28, 2026

Frank W. Volk
Chief United States District Judge